CARLTON, J.,
for the Court:
¶ 1. On June 1, 2010, Lonnie Smith filed a petition to controvert with the Mississippi Workers’ Compensation Commission (Commission) alleging that he had suffered a compensable injury while working as a lineman for Tippah Electric Power Association (Tippah). Tippah denied the com-pensability of Smith’s injury by raising the affirmative defense that the injury resulted from Smith’s own intentional misconduct. Following a hearing where Smith and several other people that he worked with on the day of the accident provided testimony and evidence, the administrative judge (AJ) found that Smith had intentionally injured himself and suffered no com-pensable injury. Smith appealed the AJ’s decision to the Commission, which affirmed the AJ’s denial of benefits. Smith appeals to this Court, arguing that the AJ’s findings are not based on substantial evidence.
¶ 2. Since we find substantial evidence to support the Commission’s decision, we affirm in accordance with our applicable standard of review.[1]
FACTS
¶ 3. On April 29, 2010, while working as a lineman for Tippah, Smith received extensive electric shock, which resulted in severe injury.
¶ 4. In his order, the AJ provided a summary of the relevant evidence from which he concluded that Smith suffered a noncompensable injury. The record reflects the AJ provided an accurate statement of the facts and evidence, stating the following:

Lonnie Smith

The claimant testified both live and by deposition. Mr. Smith is 47 years old and lives in Ripley, Mississippi. He is married with two children. He did graduate from high school and went to Northeast Mississippi Community College for two years on a football scholarship. He did not get a degree. Prior to going to work for this employer[,] he had worked in factories. He had worked for this employer for some 15 to 16 years as of April 29, 2010. He was hired as a lineman and has worked in clearing. In 1994[,] he began working for them and learned his job through on[-]the[-]job training. He also attended a week of training in Alabama. He felt he had a good performance record at work. Also, he said that he had psychological testing and never suffered from depression prior to the incident on April 29, 2010.
With regard to the incident, he said they were working on changing an underground service for a trailer. He was working in the bucket. He took a shotgun stick with him in the bucket to disconnect the hot line clamp. He did this and hung the shotgun stick on the *936 neutral wire. He stated that he also put in an I nut and hung a dolly on the pole, on the backside of the neutral wire. He said he had finished with what he could do and was waiting for them to finish on the ground when he dropped something in the bucket and bent over to pick it up. He said that while he was waiting, the bucket was about level with the neutral wire and he was about even with the hot wire.
When he took the clamp loose he said that only Todd Braddock, Freddy Crawford, Ronald Stroupe and Willie Prather were on[-]site. According to the claimant, Danny Capíes drove up while he was waiting for them to finish on the ground. According to the claimant, Ca-píes did not say anything to him when he drove up. The claimant denied that he was told to come down while he was waiting in the bucket. He also denied that he moved the bucket while he was waiting. These two key statements were contradicted by more than one witness. The claimant also stated that he was not aware as to why Capíes was there but found out later that he was there to take the claimant for a drug screen. The claimant said that he was not depressed or unhappy that day. However, as will be seen in later testimony, there were those that described the claimant as not being his usual self that day.
The claimant specifically denied intentionally grabbing the wire to electrocute himself. He also specifically denied grabbing the hot wire with one hand and the neutral wire with the other.
On cross-examination[,] he was questioned about his training [which] included on[-]the[-]job training, one week in Scottsboro, AL[,] and another class at Tippah Electric which he referred to as an advanced lineman class. He also said that they had safety classes every month or two. He considered himself to be an experienced lineman and knew what would result if one were to touch a hot phase and a neutral phase at the same time. He also stated that he knew that if you were going to get within two feet, one inch of a primary wire[,] you were supposed to wear rubber gloves as opposed to the leather gloves he was wearing.
The claimant’s version of what happened is somewhat confusing and inconsistent with the testimony of others at the scene. According to the claimant, he did not move the bucket after tightening the guide wire. He said that he dropped something in the bucket and when he came back up[,] he came in contact with the hot phase. Essentially, he only admits to coming in contact with the hot phase and not the neutral. He had no explanation how accidentally bumping the hot phase with one hand would cause such severe injuries. He admitted that there would have to be a ground for a complete circuit and asserts he does not know what the ground was in this instance.
Sam Buchanan
Buchanan was employed at [Tippah] in April of 2010. He had been there some 32 years. He has known [Smith] since the claimant began working for [Tippah] and considered him a good employee. On the day in question he was requested to have a drug screen performed on [Smith]. To his knowledge, the claimant did not know about the proposed drug screen. Buchanan instructed [Capíes] to go have the drug screen performed on the claimant.
Buchanan was not on the scene at the time of the incident. He did perform an investigation afterward. He talked with the other employees at the scene. None *937 of them told him they actually saw it occur. He did not report to the board that he thought [Smith] had done it on purpose. He did not give an opinion then or at the hearing as to whether he thought it was an accident or not.
He did not remember giving Smith’s wallet and knife back to his wife after the incident.
Buchanan was terminated by [Tippah] some two weeks after this incident. He did not testify that his termination had anything to do with the [Smith] incident. He attributed it to his age and personal animosity.

Ronald Stroupe

Stroupe has worked at [Tippah] for some 13 years. He knows the claimant. He has worked with him on the same crew. He considered Smith to be a good worker and a good employee. He was at the scene in April of 2010. Other employees there were [Prather, Capíes, Crawford, Smith, and Braddock], The homeowners were also there and others doing unrelated work.
He stepped off of the truck and was walking back when he heard the noise of the arc and had to walk out a little to see Smithy but he then had a good view from about 35 to 40 feet away. When he looked up he saw Smith with his arm and head on the primary wire and his other arm hanging down beside him outside the bucket. He also remembered seeing smoke. He did not actually see it happen and had to walk out a little from where he was to view the claimant in the bucket. He did help with the bucket rescue of Smith. He also said that the claimant received a phone call about 15 minutes before the incident.
He did not notice the claimant acting irrational that day or like he had been on drugs or anything like that. However, he did notice that the claimant had not been joking around like usual.

Todd Braddock

Braddock has been a lineman for 17 years with [Tippah.] He was hired the same day as Smith. In addition to on[-]the[-]job training, he and Smith went to apprentice lineman training in Alabama for a week. They also had safety training at least six times a year. They also brought someone in to give them some advanced lineman training.
He was also present on the day of the incident. A customer had brought a new trailer and they were in the process of providing underground service to the trailer. He had been working inside the trailer when he received a call from his union steward that [Capíes] would be coming to the site to pick up Smith. He then realized that he would have to go replace Smith in the bucket so he went outside when he saw Capíes arrive. He walked up and observed Capíes tell Smith that he needed Smith to go with him. Smith said [“0]kay[.”][“L]et me [take the] clamp off the transformer.[”] The bucket was right around the transformer when this occurred. The lip of the bucket was underneath the neutral wire. One uses an 8 foot stick to take the clamp off. He said it would be difficult to do it if the bucket was up between the neutral and primary lines. The controls on the stick are at the bottom of the stick. He did observe the claimant hook into the clamp to break it free but at some pointy Braddock turned and started back to his truck. On the way back to the truck he heard an arc[,] which he recognized from the distinctive sound. He then turned around and looked up. Upon turning around[,] he observed the claimant’s right hand on the neutral with it pulled *938 up and his left hand on the primary with smoke coming from his left hand. He described the wires as being generally 4 [feet] apart. He called 911 since he knew this would be very traumatic. He said that according to his training, very few people have lived with primary and neutral contact.
Upon further questioning of what he observed, he stated that he saw the palms of both hands on the wires. He next saw him slumped over the wire similar to the description given by Stroupe once he had walked out from the trailer and looked up. Braddock was then on the phone making the 911 call and the next time he looked up[,] the claimant had fallen into the bucket. Braddock also helped with the bucket rescue.
He did not notice Smith acting unusual that day, but did make reference to tension on the crew during the last two weeks. He also testified that the bucket had been moved by Smith between the time he turned to head back to his truck and when he heard the arc. He did not know why Smith would have moved the bucket after unhooking the clamp.

Freddy Crawford

Crawford was the line foreman on the crew on which Smith was working on the day of the incident. He had been a line foreman for [Tippah] for 10 years or longer and had worked for them for thirty-nine years. He was not working at the time of the hearing. He was on the site on the day of the incident where they were pulling an underground service to a new trailer. He remembers Capíes coming to the site asking for Smith to come down. Smith was taking a clamp off at the time. He observed him take the clamp off, but did not look back up after that until he heard the arc. Smith used the shotgun stick to unhook the transformer. He thought the claimant would then be coming down since Capíes had asked him to come down. He next heard the bucket moving because of the sound of the motor.
When he heard the are[,] he looked back up. The bucket was not in the same position as when the claimant unhooked the transformer. It was higher. He said it was above the transformer at that time. He was not aware of any work to be done above the transformer that day after the transformer was unhooked. With regard to the pulley, he said it was already there before the claimant unhooked the transformer. When he looked up he saw one of the claimant’s hands on the primary wire and one on the neutral wire. He could not recall which hand was on which wire. When the claimant fell down in the bucket[,] he went and lowered him down.
With regard to the way Smith was acting that day[,] he said he was quieter than normal. He described him as not normally being a quiet person.
He was asked if he saw a loose bolt on a guide wire whether he would go up and try to tighten it up. He said he probably would not. He said some other lineman might do it. He said he would not do it because it was above the safety zone, only about 6 inches below the primary wire.
He described Smith as being a good worker with whom he never really had any trouble, he also considered him to be a good lineman. He did not know why Capíes had come out there that day to get Smith. He said it was unusual for Capíes to come out to a job site to get one of the crew members.

Danny Capíes

Capíes is an engineer with [Tippah]. He has worked there for 7 years. He was *939 present at the site at the time of the incident. He had been sent out there to pick up Smith to take him for a drug test. He also said it was an uncommon occurrence for him to be sent out to a job site to pick up an employee. Upon arriving!,] he walked up to the foreman, Crawford, and told him that he needed Smith to go with him. Smith was then told to come down. He did not recall hearing Smith respond.
He looked up at Smith and observed him using the stick to disconnect the clamp. He recalled seeing Smith hang the stick on the neutral line when he finished unhooking the clamp. He recalled the bucket being located just underneath the transformer when this was occurring. When the claimant began to move the bucket he moved a couple of steps away, waiting for him to come down. He did not see the bucket moving but heard the motor rev up. He was looking away when he heard a buzzing sound and then looked back up at the bucket. He saw Smith in contact with the primary and neutral lines. The only time that had passed was just long enough for him to take a couple of steps. When he looked up, the bucket was not in the same place as before!;] it had been moved up and to the left, further away from the pole.
In describing what he saw, he said that Smith was gripping the lines with his hands. He believes the left hand was on the primary and the right hand was on the neutral. He said that the claimant fell down in the bucket!,] and they began to get the bucket down. He did recall seeing the claimant’s leather gloves when he came down. He said that they were both burned in the palm area. Ca-píes did not have the gloves. He said they were not removed at the site. He said they would have been removed at the hospital as far as he was aware.
He said that Smith did not know why he was out there to get him. He said the company was suspicious that Smith had been using drugs and that is why they wanted him drug tested. He has never seen the result of the drug test but would not disagree if told the test was negative. He has never been told by the company that Smith was using drugs out there that day. It is noted that in claimant’s exhibit 1, the drug screen was negative except for the opiates given him at the hospital.
He did recall giving the claimant’s wife his knife and wallet. He did not know where they came from or if they were found in the bottom of the bucket.

Michael Glen Weltzheimer

Weltzheimer is assistant to the vice president of safety and loss control for the Electric Power Association of Mississippi. He has been with them for 19 months. Prior to that he was a manager of safety and loss control for an electric co-op out in Texas for five years. He investigated this incident in response to a call from his boss, Stan Rutger. He was in Laurel when he received the call, went back to Canton to get some clothes and went straight up to Ripley, arriving around 9 that night. He first went to the scene around 11:00 the next day. He testified that the pictures ([p]ut into evidence as E/C 3) were taken by him. He explained why there were no pictures identified as pictures 1, 2, and 11. He said that the pictures accurately represent what he saw at the scene and explained what was in the pictures. He said that the only difference between what was in the pictures and the time of the incident is that the jumper had been put back to the transformer so that the power was restored.
*940 He also took measurements at the scene. This was to see if the line met code which he opined that it did. He said that the distance between the primary and the neutral at the sag was 8 feet 7 inches. He said a perfect sag would be 4 feet. Closer to the pole the distance between the line was 3 feet 9 inches, closer to 4 feet. He testified that he had not heard of other situations where someone had come in contact with both wires with [his], hands or arms. He has heard of instances where one body part came in contact with one and some piece of equipment came in contact with the other.
He said that he did take statements from the witnesses. He met with them as a group first but only to see how they were doing. When he interviewed them about what happened, he met with each of them separately. He then got them to write out their statements and sign them. He said that in speaking with them and- taking their statements, none of them actually saw the incident as it occurred.
STANDARD OF REVIEW
¶ 5. “This Court’s scope of review in workers’ compensation cases is limited to a determination of whether the decision of the Commission is supported by substantial evidence.” Whirlpool Corp. v. Wilson, 952 So.2d 267, 271 (¶ 15) (Miss.Ct. App.2006). We recognize that the “Commission sits as the ultimate finder of fact; its findings are subject to normal[ ] deferential standards upon review.” Id. Reversal is only proper “where findings of fact are unsupported by substantial evidence, matters of law are clearly erroneous, or the decision was arbitrary and capricious.” Id.
¶ 6. Additionally, we note that Tippah raised an affirmative defense asserting that Smith had suffered an injury as a result of his own intentional misconduct. This Court has stated that “[i]t is fundamental that the burden of proof of affirmative defenses rests squarely on the shoulders of the one who expects to avoid liability by that defense.” A.F. Leis Co. v. Harrell, 743 So.2d 1059, 1061 (¶9) (Miss. Ct.App.1999). Tippah, the employer, was required to prove by a preponderance of the evidence Smith’s own intentional misconduct. Id.[2]
DISCUSSION
¶ 7. Smith argues that the AJ’s decision to deny workers’ compensation benefits was not based on substantial evidence. We disagree.
¶ 8. A compensable injury under the Mississippi Workers’ Compensation Act is defined as an
accidental injury or accidental death arising out of and in the course of employment without regard to fault which results from an untoward event or events, if contributed to or aggravated or accelerated by the employment in a significant manner.
Miss.Code Ann. § 71-3-3(b) (Rev.2011) (emphasis added). The Mississippi Workers’ Compensation Act specifically excludes liability, however, for injuries due to the “willful intention of the employee to injure or kill himself.” Miss.Code Ann. § 71-3-7(4) (Supp.2012). See L.B. Priester & Son v. McGee, 234 Miss. 471, 479, 106 So.2d 394, 397 (1958) (“Where there is a wilful intention of the employee to injure *941 himself, compensation is not payable under the Workers’] Compensation Law.”).
¶ 9. The record contains the opinion of the AJ identifying the following substantial evidence to support the Commission’s decision that Smith acted in such a way as to intentionally injure himself.[3] The AJ found as follows:
In evaluating the evidence it is hard to find the claimant’s testimony to have much credibility. First of all[,] he seems to have no clear recollection of exactly what happens upon supposedly dropping something in the bucket and raising back up. According to the claimant he only recalls coming in contact with the primary and not the neutral. No less than three witnesses saw the claimant’s hands in contact with both the primary and neutral lines. One witness, [Stroupe,] testified that he had to walk away from the truck and when he looked up[,] he saw the claimant with his arm and head on the primary with the other arm hanging down. It seems clear that he simply did not see the claimant as quickly as the other witnesses. This is consistent with the second position that the claimant was observed to be in by [Braddock], who said he first observed the claimant with the primary in one hand and the neutral in the other and then saw him slump down on the primary, similar to the description given by Stroupe. [Crawford] and [Capíes] also saw the claimant with one hand on the primary and one hand on the neutral lines. Capíes recalled observing the claimant’s leather gloves after the incident and that there were burn marks on the palms of both gloves. The testimony of the witnesses at the scene all seems consistent with each other and inconsistent with the testimony of the claimant.
There are also other inconsistencies between the claimant’s testimony and that of the witnesses. The claimant said he had already disconnected the clamp before Capíes arrived at the scene and had already moved the bucket to a higher level. However, Capíes, Braddock, and Crawford all testified that the clamp was removed after Capíes arrived and the bucket had been moved between the unhooking of the clamp and the ... incident. Crawford said that it was higher. Capíes said that it was higher and further away from the pole.
Smith even denies that he was ever told to come down upon the arrival of Capíes. Braddock, Crawford, and Capíes all testified that the claimant was told to come down.
The one thing that is clear from the testimony of the claimant is that he was an experienced lineman and was fully aware of the potential consequences of coming in contact with the primary and neutral lines at the same time. He also acknowledged that he knew that if he was going to get within two feet one inch of the primary wire he was supposed to wear rubber gloves, which he was not wearing.
The Administrative Judge also takes note of the almost 4 feet in distance between the primary line and the neutral line.
Based on the above inconsistencies between the testimony of the claimant and other witnesses at the scene, the Admin *942 istrative Judge finds that the claimant’s testimony as to the incident itself and the events leading up to the incident is not credible. Based on the testimony of the other witnesses at the scene[,] the Administrative Judge finds that the claimant had one hand on the primary line and one on the neutral line at the time of the incident. Given the almost 4 feet between the lines[,] it is found that he intentionally placed his hands on the lines being fully aware of the potential harmful consequences of such an act.
¶ 10. This Court recognizes the limited standard of review that appellate courts must utilize when considering the Commission’s findings. We acknowledge that this Court is not the trier of fact, and, absent any error of law, we only reverse where the decision of the Commission lacks the requisite evidentiary support of substantial evidence. See Whirlpool, 952 So.2d at 271 (¶ 15). In the case at bar, the record demonstrates that substantial evidence exists to support the decision of the AJ, and also of the Commission, that Tippah and its carrier, Electric Power Associations of Mississippi Workers’ Compensation Group Inc., proved that Smith intentionally injured himself.[4] Therefore, we find no abuse of discretion in the Commission’s decision, which affirmed the AJ’s denial of workers’ compensation benefits to Smith.
¶11. THE JUDGMENT OF THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., ISHEE, ROBERTS, MAXWELL AND FAIR, JJ., CONCUR. GRIFFIS, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES AND JAMES, JJ.

. See Whirlpool Corp. v. Wilson, 952 So.2d 267, 271 (¶ 15) (Miss.Ct.App.2006); see also Miss.Code Ann. § 71-3-7(4) (Supp.2012); see generally Jeffrey Jackson & Mary Miller, Encyclopedia of Mississippi Law § 76:142 (2002) (discussing affirmative defenses and requisite proof).

. See also Marshall Durbin Co. v. Warren, 633 So.2d 1006, 1009 (Miss. 1994); see also Miss. Code Ann. § 71-3-7(4).

. While this Court is limited to a determination of whether the findings of the Commission are supported by substantial evidence, the Commission in this case did not provide its own findings of fact; rather, it affirmed those of the AJ. As such, we will examine the findings of fact of the AJ. See McDowell v. Smith, 856 So.2d 581, 585 (¶ 10) (Miss.Ct. App.2003).

. See Petroleum Equip. Co. v. Lancaster, 197 So.2d 485, 487 (Miss. 1967) (explaining that unexpected injuries fall within the category of accidents occurring within the course and scope of employment but that no compensation is payable for injuries resulting from employee’s willful misconduct to kill or injure himself or another); Whirlpool, 952 So.2d at 271 (¶ 15); A.F. Leis, 743 So.2d at 1061 (¶ 9); See also Miss.Code Ann. § 71-3-7(4).